UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETER MAYER PUBLISHERS INC. d/b/a
OVERLOOK PRESS,

                Plaintiff,

- against -

DARIA SHILOVSKAYA and SERGEY
SHILOVSKIY,

                Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/2014

**MEMORANDUM
OPINION & ORDER**

12 Civ. 8867 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      This is a declaratory judgment action that involves a copyright dispute. In 1995, Ardis Publishers, the predecessor-in-interest to Plaintiff Peter Mayer Publishers, Inc., d/b/a Overlook Press, secured a copyright to the English translation ("the Translation") of The Master and Margarita ("the Work"), a Russian novel written by Mikhail Bulgakov. The Work had fallen into the public domain for failure to comply with the formalities of the United States Copyright Act. Plaintiff, or its predecessor-in-interest, has been publishing the Translation in printed form since that time. Plaintiff now seeks a declaratory judgment confirming its right to publish the Translation in electronic book ("eBook") form.

      Defendants Daria Shilovskaya and Sergey Shilovskiy – Bulgakov's descendants – oppose Plaintiff's request. They hold a restored copyright interest in the Work as a result of the Uruguay Round Agreements Act ("URAA"). The URAA, codified at Section 104A of the Copyright Act, restored copyrights to certain foreign works, but also offered safeguards to those who, like Plaintiff, had relied on the public domain status of those works. Defendants acknowledge Plaintiff's right under Section 104A to continue publishing the print version of the

Translation. They argue, however, that an eBook version of the Translation would constitute a new "derivative work" and therefore infringe on their restored copyright.

Accordingly, this Court must decide whether an eBook version of the Translation constitutes a new derivative work for purposes of Section 104A(d)(3)(B) of the Copyright Act. For the reasons set forth below, the Court determines that it does not. Plaintiff's motion for summary judgment will therefore be granted.

## BACKGROUND

Bulgakov wrote the Work, which critics have lauded as one of the greatest novels of the twentieth century, sometime before his death in 1940. (Joint Stipulation ("Joint Stip.") (Dkt. No. 15-1) ¶ 5) The Work offers a phantasmagorical view of life in Stalinist Russia. (Id.) Although fiction, Russian authorities suppressed its publication. (Id.) The Work was not published until 1968 when Bulgakov's heirs – predecessors-in-interest to Defendants – authorized its publication in France. (Id. ¶ 6)

Because Bulgakov's heirs did not comply with the formalities of American copyright law, the Work entered the public domain when it was initially published. (Id. ¶ 7) In 1989, Ardis Publishers ("Ardis"), predecessors-in-interest to Plaintiff, commissioned the English-language Translation. (Id. ¶ 9) Ardis registered a copyright for the Translation in 1995 and began publishing it in hardcover and paperback. (Id. ¶ 10-11) In 1999, Ardis licensed the print publication rights to the Vintage division of Random House, Inc., and Vintage continues to publish the Translation in paperback. (Id. ¶ 12) Plaintiff succeeded to all rights in the Translation when it purchased Ardis in 2001. (Id. ¶ 8) No electronic version of the Translation currently exists. (Id. ¶ 13)

In 1994, Congress enacted the Uruguay Round Agreements Act. (Id. ¶ 18) The URAA amended Section 104A of the Copyright Act to restore U.S. copyright protection to many foreign works then in the public domain, including Bulgakov's The Master and Margarita. (Id. ¶¶ 18-19) For restoration of copyright protection, Section 104A requires, inter alia, that (1) at the time the work was created, at least one of its authors was a native or domiciliary of an eligible source country; (2) the work was not in the public domain in the eligible source country due to expiration of the protection period; and (3) the work was in the public domain of the United States on the date of the URAA's enactment for one of three reasons: (i) failure to comply with statutory formalities, (ii) lack of protection for sound recordings prior to 1972, or (iii) lack of a copyright relationship between the United States and the country of production at the time of publication. See 17 U.S.C. § 104A(h)(6)(B)-(D). Because the Work met these conditions, its copyright was restored as of January 1, 1996, the URAA's effective date. (Joint Stip. (Dkt. No. 15-1) ¶¶ 20-21); 17 U.S.C. 104A(h)(2)(A). Defendant Shilovskaya filed a Notice of Intent to Enforce the restored copyright on July 31, 1997. (Joint Stip. (Dkt. No. 15-1) ¶ 20)

While Section 104A restored copyright protection to many foreign works, the statute also offered certain safeguards and benefits to parties who had previously relied on the public domain status of those works.[1] See 17 U.S.C. § 104A(h)(4). First, Section 104A "imposed no liability for any use of foreign works occurring before restoration." Golan, 132 S. Ct. at 883. Second, the statute permitted "reliance parties" to continue to exploit a restored work until the owner of the restored copyright gave notice of an intent to enforce the copyright. Id. (citing 17 U.S.C. § 104A(c), (d)(2)(A)(i)). Finally, those parties who, like Plaintiff, created a

---

[1] The safeguards included in Section 104A reflected Fifth Amendment Taking Clause concerns. See Golan v. Holder, __U.S__, 132 S. Ct. 873, 883 (2012).

3

"derivative work," are allowed to continue to exploit that work indefinitely as long as they pay the copyright holder "reasonable compensation." Id. (citing 17 U.S.C. § 104A(d)(3)).

Here, Plaintiff has compensated Defendants in connection with its publication of the Translation in print form. (Def. 56.1 Stmt. (Dkt. No. 20) ¶ 6). Plaintiff now intends to publish an eBook version of the Translation. (Joint Stip. (Dkt. No. 15-1) ¶ 14). Defendants contend that Plaintiff's reliance interest in the Translation does not extend to an eBook version of the Translation, because an eBook version would constitute an entirely new derivative work. (Id. ¶ 27)

Plaintiff asks this Court for a declaration that an eBook version of the Translation would not constitute a new derivative work under the Copyright Act. In the event that this Court issues a declaratory judgment in Plaintiff's favor, both sides request that this Court also determine the reasonable compensation amount under Section 104A(d)(3)(B). (Joint Stip. (Dkt. No. 15-1) ¶ 29)

## DISCUSSION

### I.  LEGAL STANDARD

"A court may properly address the merits of a declaratory judgment action through a motion for summary judgment." Middlesex Ins. Co. v. Mara, 699 F. Supp. 2d 439, 444 (D. Conn. 2010). Summary judgment is warranted when the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that

4

could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). However, "a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)).

## II. THE PROPOSED EBOOK IS NOT A NEW DERIVATIVE WORK AND WOULD NOT INFRINGE ON DEFENDANTS' RESTORED COPYRIGHT

The Berne Convention for the Protection of Literary and Artistic Works is the primary international agreement governing copyright relations. Golan, 132 S. Ct. at 877. Although the Berne Convention took effect in 1886, the United States did not recognize the Convention until 1989. Id. In 1994, in order to fulfill this nation's obligations under the Convention, Congress enacted a statute giving foreign copyrighted works the same protections that U.S. copyrighted works enjoy. Id. at 877-78. These protections are set forth in Section 514 of the Uruguay Rounds Agreement Act, which is codified at Section 104A of the Copyright Act. Id. at 878; see 17 U.S.C. § 104A.

Prior to the URAA's passage, Bulgakov's The Master and Margarita had never been registered in the United States. Consequently, it had fallen into the public domain. (Joint Stip. (Dkt. No. 15-1) ¶ 7) The parties agree that Section 104A(h)(6) restored the Work's copyright status. (Id. ¶ 19) That Section provides:

> [t]he term "restored work" means an original work of authorship that . . . is in the public domain in the United States due to noncompliance with formalities imposed at any time by United States copyright law, including failure of renewal, lack of proper notice, or failure to comply with any manufacturing requirements[.]

17 U.S.C. § 104A(h)(6)(C)(i).

5

The parties also agree that Defendants are the rightful owners of the restored copyright in the Work. (Joint Stip. (Dkt. No. 15-1) ¶ 21) "A restored work vests initially in the author or initial rightholder of the work as determined by the law of the source country of the work." 17 U.S.C. § 104A(b). "Copyright subsists, in accordance with this section, in restored works, and vests automatically on the date of restoration." Id. § 104A(a)(1)(A). "The 'date of restoration' of a restored copyright is . . . January 1, 1996 . . ." Id. § 104A(h)(2). Under Russian law, Defendants are the initial rightholders of the Work, and on January 1, 1996, they became the sole owners of the restored United States copyright. (Joint Stip. (Dkt. No. 15-1) ¶¶ 15, 21)

In restoring copyright protection for certain foreign works that had entered the public domain, Congress provided a safe harbor for those who had created "derivative works" based on these foreign works. Section 104A defines these "reliance part[ies]" as those who, "with respect to a particular work, engage[d] in acts, [before restoration] which would have violated section 106 [copyright infringement] if the restored work had been subject to copyright protection, and who, [after restoration], continue[ ] to engage in such acts." 17 U.S.C. § 104A(h)(4)(A). Both sides agree that Plaintiff is such a "reliance party," because the Translation is a "derivative work" that was commissioned and copyrighted while the Work was still in the public domain. (Joint Stip. (Dkt. No. 15-1) ¶ 22)

A reliance party may continue to exploit its derivative work so long as it pays the owner of the restored copyright "reasonable compensation," as determined by private agreement or court order. 17 U.S.C. § 104A(d)(3). Section 104A(d)(3)(A) provides:

> a reliance party may continue to exploit that derivative work for the duration of the restored copyright if the reliance party pays to the owner of the restored copyright reasonable compensation for conduct which would be subject to a remedy for infringement but for the provisions of this paragraph.

6

Id. § 104A(d)(3)(A). Here, the parties agree that Plaintiff has at all times paid the Defendants a mutually agreed upon royalty for Plaintiff's continued publication of the Translation in print form. (Joint Stip. (Dkt. No. 15-1) ¶ 24)

Plaintiff now wishes to publish the Translation in eBook form, however, and it seeks a declaration that it is authorized to do so under Section 104A(d)(3)(A). (Cmplt. (Dkt. No. 1)) While the owner of a derivative copyright has no rights in the underlying work on which it is based, see 17 U.S.C. § 103(b), Plaintiff nonetheless contends that it may publish the Translation as an eBook under Section 104A(d)(3)(A), because the proposed eBook would merely be "a copy of the Translation." (Pltf. Br. (Dkt. No. 15) at 4) Defendants disagree, arguing that Section 104A(d)(3)(A) does not afford Plaintiff "the right to use the Work to create a new work in an entirely different medium of expression . . . without the authorization of the proprietors of the [restored] copyright in the Work." (Def. Br. (Dkt. No. 19) at 5) Defendants have advised Plaintiff that they intend to bring an infringement action should Plaintiff proceed with its plan to publish the proposed eBook. (Joint Stip. (Dkt. No. 15-1) ¶ 27)

### A.   The Proposed eBook Is Not a New Derivative Work

In deciding whether Section 104A authorizes Plaintiff's proposed eBook, this Court must determine whether an eBook of the Translation constitutes a new "derivative work" under the Copyright Act. Section 101 of the Copyright Act defines a "derivative work" as:

> a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

17 U.S.C. § 101.

7

The task of statutory interpretation begins "with the language of the statute itself." United States v. Ron Pair Enters., Inc., 489 U.S. 235 (1989). "The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 450 (2002) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) (citing Ron Pair Enters., Inc., 489 U.S. at 240)). "[The] inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." Robinson, 519 U.S. at 340 (internal quotations omitted).

Here, the statutory definition of "derivative work" consists of two sentences. The first sentence tells us that a "derivative work" is "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed or adapted." 17 U.S.C. § 101. Accordingly, a "derivative work" is a work based on a pre-existing work and that is in one of the listed forms – such as a translation – or in another form in which the pre-existing work is similarly "recast, transformed, or adapted." A common feature among the forms of works listed in the statutory definition is that each requires changes or alterations to a copyrighted work's content.

The second sentence of the statutory definition for "derivative work" explains that the new work "must represent an original work of authorship" to constitute a "derivative work." Id.

The proposed eBook will not reflect the content-based changes referenced in the first sentence of the statutory definition of "derivative work." Moreover, the proposed eBook does not satisfy the originality element of the statutory definition. Accordingly, as discussed below, the Court concludes that the proposed eBook is not a new "derivative work."

8

### 1. The Proposed eBook is Not a New Recasting, Transformation, or Adaptation of the Original Work

The list of forms enumerated in the statutory definition's first sentence does not reference electronic books, but the list includes a residual clause extending the definition of a "derivative work" to "any other form in which a work may be recast, transformed, or adapted." Id. In determining the meaning of the phrase "recast, transformed, or adapted," it is appropriate to look to the examples cited in the statute, which immediately precede the phrase at issue:

> The wording of [the statute] calls for the application of the maxim ejusdem generis, the statutory canon that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991); see also Norfolk & Western [Ry.] Co. v. [Am.] Train Dispatcher[s' Ass'n], 499 U.S. 117, 129 (1991). Under this rule of construction the residual clause should be . . . controlled and defined by reference to the enumerated categories . . . which are recited just before it. . . .

Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114-15 (2001). This Court recognizes that "[c]anons of construction need not be conclusive and are often countered . . . by some maxim pointing in a different direction. The application of the rule ejusdem generis in this case, however, is in full accord with other sound considerations bearing upon the proper interpretation of the clause." Id. at 115.

All of the forms of "works" listed in the statutory definition of "derivative work" reference changes and alterations in the content of the pre-existing work, or changes and alterations in both the content and the medium of that work. None of the listed forms describes a change in medium alone. A "translation," for example, requires the selection of new words, phrases, and idioms that are not part of the original work. A "musical arrangement" involves the exercise of artistic judgment concerning, inter alia, composition, rhythm, and lyrics. A "dramatization" or "fictionalization" involves the introduction of fictional elements to an

9

existing story. A "motion picture version" of a book or play involves elements of production, direction, and acting, as well as innumerable artistic judgments about how much of the original work will be used. A "sound recording" of a musical performance or other live event will likewise involve innumerable production and editing determinations. An "art reproduction" typically involves taking an image, sculpture, or other work of art and introducing new colors, shadowing, or otherwise recomposing the original work. A "condensation" or "abridgement" of a literary work is, by definition, a presentation of something less than the original work. Accordingly, the terms "recast, transformed, or adapted" must similarly be read to refer to content-based changes.

Had Congress wished to afford derivative work status to works involving changes in medium alone, one would expect to see references to, for example, "hardcover," "softcover," "VHS," and "CD." Moreover, under the Copyright Act, changes in medium generally do not involve sufficient originality to justify copyright protection. See L. Batlin & Son, Inc. v. Snyder, 536 F.2d 486, 491 (2d Cir. 1976) ("to support a copyright there must be at least some substantial variation, not merely a trivial variation such as might occur in the translation to a different medium"); see also id. (quoting 1 Melville B. Nimmer, The Law of Copyright § 20.2, at 94 (1975)) ("'the mere reproduction of a work of art in a different medium should not constitute the required originality for the reason that no one can claim to have independently evolved any particular medium'"; plastic recreation of sculpture originally copyrighted in metal not a derivative work); Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 910 (2d Cir. 1980) (plastic recreation of Disney figurines not a derivative work); Past Pluto Prods. Corp. v. Dana, 627 F. Supp. 1435, 1443 (S.D.N.Y. 1986) (remodeling of the Statute of Liberty as a foam hat not a derivative work).

Section 101 reflects copyright law's general requirement of "media-neutrality." The concept of "media-neutrality" – that a change in medium does not affect a copyrighted work's status – is well-settled. See N.Y. Times Co., Inc. v. Tasini, 533 U.S. 483, 502 (2001) ("'the transfer of a work between media' does not 'alte[r] the character of' that work for copyright purposes"); Faulkner v. Nat'l Geographic Soc'y, 409 F.3d 26, 40 (2d Cir. 2005) ("the transfer of a work from one medium to another generally does not alter its character for copyright purposes") (citing Tasini, 533 U.S. at 502); Past Pluto Prods. Corp., 627 F. Supp. at 1441 ("[A] copyright claimant's production of a work of art in a different medium cannot by itself constitute the originality required for copyright protection.") (citing L. Batlin & Son, Inc., 536 F.2d at 491).

While an eBook is "a separate medium from the original use – printed words on paper," Random House, Inc. v. Rosetta Books LLC, 150 F. Supp. 2d 613, 622, aff'd 283 F.3d 490 (2d Cir. 2002), the process of transferring the print version of the Translation to eBook form would involve nothing more than rote copying. (See Carns Decl. (Dkt. No. 15-2) ¶ 12 ("We send a PDF file of the book to be converted to the conversion company. . . . The conversion process does not add or subtract any text or other material to the book. The file that comes back to us appears as a screen-readable copy of the same book.")) As such, conversion of the Translation to eBook form constitutes a change in medium only, and does not constitute a new "derivative work" under 17 U.S.C. § 101.

Defendants contend, however, that Rosetta Books, 150 F. Supp. 2d 613, demonstrates that the proposed eBook here is a new derivative work. (Def. Br. (Dkt. No. 19) at 9-10) In Rosetta Books, several prominent authors – including Kurt Vonnegut, William Styron and Robert B. Parker – had signed contracts between the 1960s and early 1980s giving Random

11

House the right to publish their books "in book form." 150 F. Supp. 2d at 615-17. These authors later signed contracts with other publishers authorizing publication of their books in eBook form. Id. at 614. Random House sued the eBook publishers for copyright infringement. Id. Given that eBooks did not exist when the authors' contracts were signed, the question before the court was whether the original contracting parties had intended the term "book form" to encompass all subsequent medium changes. Id. Applying New York contract law, the district court ruled in favor of the eBook publisher, primarily because it found that "the publishing industry generally interprets the phrase 'in book form' as granting the publisher 'the exclusive right to publish a hardcover trade book in English for distribution in North America.'" Id. at 622. On that basis, the court determined that an eBook did not fall within the contractual term "book form." Id. at 621-22 ("'[T]he sole and exclusive right to publish, print and market in book form' – especially when the author had specifically reserved rights for himself – was 'much more limited' than 'the sole and exclusive right to publish, print and market the book.'") (quoting Field v. True Comics, Inc., 89 F. Supp. 611, 612 (S.D.N.Y. 1950) (emphasis in original)). Given that Rosetta Books turns on a question of contract interpretation, it is of little relevance here.[2]

---

[2] The Rosetta Books court made clear that an eBook represents a "new use" of the printed book, not a "new work":

> [A] significant difference between the licensee in the motion picture cases cited above [where a motion picture was created from a play] and the book publisher in this action [who has created an eBook from a printed book] is that the licensees in the motion picture cases have actually created a new work based on the material from the licensor. . . . In the book publishing context, the publishers, although they participate in the editorial process, display the words written by the author, not themselves.

Rosetta Books, 150 F. Supp. 2d at 623 (emphasis added). This distinction, of course, undermines Defendants' argument here that the eBook constitutes a new derivative work.

12

Because conversion of the Translation to eBook form constitutes a change in medium only, the proposed eBook does not constitute a new "derivative work" under 17 U.S.C. § 101.

### 2. The Proposed eBook is Not an Original Work

The second sentence of the statutory definition of "derivative work" states: "[a] work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'" 17 U.S.C. § 101. Thus, a work that is not sufficiently "original" cannot be considered a "derivative work." See Woods v. Bourne Co., 60 F.3d 978, 990 (2d Cir. 1995) ("The basis for copyright protection contained in both the constitution and the Copyright Act is originality of authorship.") (citing L. Batlin & Son, Inc., 536 F.2d at 490); Conan Props., Inc. v. Mattel, Inc., 712 F. Supp. 353, 358, (S.D.N.Y. 1989) ("Another basic precept holds that authors can only copyright expressions that are 'original.'") (citing 17 U.S.C. § 102 (a)).

"To determine whether a work is sufficiently original to be a derivative work, the judge in a bench trial must make findings of fact based upon a comparison of two works. The judge must then apply the legal standard of originality to the facts to determine whether the standard has been met." Woods, 60 F.3d at 991. The legal standard of originality is "'distinguishable variation' that is more than 'merely trivial.'" 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 3.03 (2013) (quoting Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F.2d 99, 102-03 (2d Cir. 1951)); see also Waldman Pub. Corp. v. Landoll, Inc., 43 F.3d 775, 782 (2d Cir. 1994) (requiring "variation that is more than merely trivial"); L. Batlin & Son, Inc., 536 F.2d at 492 (denying derivative work status to works with only "minuscule variations").

13

No court has addressed whether the process of transferring a literary work from print to eBook form involves more than "merely trivial" variations. The Supreme Court has held, however, that rote copying will not satisfy the originality requirement. Feist Publ'ns, Inc. v. Rural Tel. Srv. Co., Inc., 499 U.S. 340, 345 (1991) (originality requirement is not met where "similarity is . . . the result of copying"). In Feist, the Court held that the process of copying telephone numbers into a white pages directory did not satisfy "minimum constitutional standards" of originality:

> The selection, coordination, and arrangement of Rural's white pages do not satisfy the minimum constitutional standards for copyright protection. . . . In preparing its white pages, Rural simply takes the data provided by its subscribers and lists it alphabetically by surname. The end product is a garden-variety white pages directory, devoid of even the slightest trace of creativity.

Feist, 499 U.S. at 362. Under Feist, the rote copying necessary to produce an eBook version of the Translation does not satisfy the originality element of the "derivative work" definition.

Defendants argue, however, that the eBook is an "original work of authorship" because the "[p]reparation of an ebook from a printed book requires the exercise of human creativity to create the software necessary to manipulate the data and allow the reader to view it in the form of text and interact with that data over the internet." (Def. Br. (Dkt. No. 19) at 11) In support of this argument, Defendants submit detailed information concerning the characteristics of an eBook in each of the formats that Plaintiff intends to use – Amazon Kindle, Apple iBook, and Barnes & Noble Nook – including the ability of a reader to click on words and hear definitions, access websites by clicking on links in the eBook, or make notations in the eBook. Id. at 6-7; see Shamos Decl. (Dkt. No. 18) ¶¶ 16-42 ("[The Amazon Kindle] is 'reflowable,' which means that the content is restructured so that it always fits within the screen on which it is being displayed. . . . [The Apple iBook] allows complex movement within a

document, allowing linking of entire chapters, sections, footnotes, or individual words. . . . [With the Barnes & Noble Nook,] if the user does not know the meaning of a word, the definition will appear if the user taps on the word and holds a finger or stylus over it."). Defendants argue that these features are "modifications" or "elaborations" that "recast, transform, or adapt" the printed book, making it a new "derivative work" under the Copyright Act. (Def. Br. (Dkt. No. 19) at 9)

        Defendants' argument is not persuasive. As Plaintiff notes, the software required to create the eBook is separately copyrighted. (Pltf. Reply Br. (Dkt. No. 17) at 3) While the software itself is an "original work of authorship," merely inputting the contents of the eBook into this software does not create a new derivative work. The eReader software would not alter the content of the Translation at all. The software would not add to or subtract from the Translation, nor would it "recast, transform or adapt" the Translation's pre-existing content. The pop-up definitions are a component of the software; they are not created or provided by Plaintiff. (See Carns Decl. (Dkt. No. 15-2) ¶¶ 11-13) Finally, whatever minor formatting changes would take place when the Translation is transferred from print to eBook – such as pages that are re-sized to fit an eReader screen – are legally insufficient to render the eBook a derivative work. See Matthew Bender & Co. v. West Pub. Co., 158 F.3d 693, 699 (2d Cir. 1998) ("[T]he insertion of page breaks and the assignment of page numbers . . . is determined by an automatic computer program, and West does not seriously claim that there is anything original or creative in that process."); Nimmer & Nimmer, supra § 3.03 ("Given that copying the location of page breaks does not replicate any original expression, it is not actionable."); Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc., 780 F. Supp. 1283, 1291-92 (N.D. Cal. 1991) (technology that allows a

user of a copyrighted video game to speed through the game or modify the activities of the game does not create a derivative work in the modified game).

In any event, Defendants' focus on the application of the separately copyrighted eBook software is misplaced. The issue is the degree of creativity and originality necessary to convert the print version of the Translation into an eBook version; not the operation of the software necessary to view the eBook version.

With respect to the content of the Translation, the procedure to transfer it to eBook form involves little more than pure transcription:

> We send a PDF file of the book to be converted to the conversion company. This company returns it to us converted into a file called an ePub file. . . . [T]hat file is passed on to the etailers . . . The content of the file as it goes from PDF to ePub is unchanged. The conversion process does not add or subtract any text or other material to the book. The file that comes back to us appears as a screen-readable copy of the same book.

(Carns Decl. (Dkt. No. 15-2) ¶ 12) Because the proposed eBook does not satisfy the minimum standard of originality required by Feist, it cannot be considered an "original work of authorship" for purposes of the Copyright Act.

Defendants contend that the conversion process itself leads to the creation of a new derivative work. (Def. Br. (Dkt. No. 19) at 7) This type of conversion is contemplated by the Copyright Act, however, and does not result in the creation of a new "derivative work." The Act protects all "original works of authorship," such as the Translation, that are "fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). The statute thus protects the process of converting the Translation from printed format to a "screen-readable copy of the same book" in eBook format,

just as it would the process of reproducing the Translation in hardcover, large-print, or any other method of communicating the exact text of the Translation.

In sum, creation of the proposed eBook version of the Translation would not result in a new "derivative work" under the Copyright Act, and would not infringe any copyright interest of the Defendants.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is granted. The Clerk is directed to terminate the motion (Dkt. No. 14).

Briefing concerning the compensation issue will proceed on the following schedule:

Defendants' papers are due on **April 11, 2014**;

Plaintiff's papers are due on **April 25, 2014**; and

Defendant's reply, if any, is due on **May 2, 2014**.

Dated: New York, New York
      March 31, 2014

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge